UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| LAKESIDE INN, INC.,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>BANK OF THE WEST,<br><br>　　　　　Defendant. | 3:14-cv-00473-RCJ-WGC<br><br>**ORDER** |

This case arises out of the breach of a loan agreement. Pending before the Court is a Motion for Summary Judgment (ECF No. 11). Plaintiff has opposed the motion and alternatively requested that the Court defer ruling until it can take three more depositions. For the reasons given herein, the Court grants the motion and makes the requested declarations, accordingly.

**I.　FACTS AND PROCEDURAL HISTORY**

Plaintiff Lakeside Inn, Inc., d.b.a. Lakeside Inn & Casino (the "Casino") sued Defendant Bank of the West (the "Bank") in Nevada state court for declaratory and "further" relief under Nevada law. The Bank removed under 28 U.S.C. §§ 1441, 1332. The relief sought is cognizable under §§ 2201, 2202.

On March 20, 2009, the parties entered into a Term Loan Agreement ("TLA") and Promissory Note ("TLA Note") for $6.5 million. (V. Compl. ¶5, ECF No. 1-3). Under the 10-year Note, the unpaid principal balance accrues interest at a rate of 2.8% above the one-month LIBOR rate, adjusted monthly ("Interest Option 2"). (*Id.*). The TLA Note matures on March 15, 2019. (*Id.*). The parties modified the TLA on April 12, 2012 via the Term Loan Modification Agreement ("TLMA"). (*Id.*). Because the Casino selected Interest Option 2 on the TLA Note, there was no prepayment penalty, and no loan fee was due. (*Id.* ¶ 6). On March 20, 2009, the parties also entered into a Revolving Line of Credit Loan Agreement ("RELOC") and Promissory Note ("RELOC Note"), attached as Exhibits 4 and 5 to the VC, for $1 million, accruing interest at a rate of 0.50% above the prime rate, and maturing on May 15, 2011. (*Id.* ¶ 7). On February 24, 2009, the parties entered into an International Swaps and Derivatives Association, Inc. Master Agreement ("Swap Agreement"), in which the parties agreed interest on the TLA would be a fixed rate of 6%. (*Id.* ¶ 8).[1]

All of these agreements were secured by a Deed of Trust and Security Agreement and Fixture Filing with Assignment of Rent against eight parcels of the Casino's real property and

---

1 The allegations in paragraph 8 of the Verified Complaint are confusing for several reasons. First, it seems odd that the Bank would agree in February 2009 to a fixed rate of 6% on a loan to be signed the following month, and then, when it came time to execute the loan itself in March 2009, provide a variable rate in the terms of the loan itself. Second, the allegation indicates that the Swap Agreement was "dated February 24, 2009" but that the parties were "authorized" to enter into the Swap Agreement via the March 20, 2009 TLA. That allegation is chronologically confusing. Perhaps the date of authorship of the Swap Agreement was February 24, 2009, but the parties did not execute it until after they executed the March 20, 2009 TLA. But the Casino has not alleged the date of execution of the Swap Agreement except to note it was "dated February 24, 2009." Third, the Casino alleges that the Bank offered the fixed 6% interest rate via the Swap Agreement "in response to [the Casino's] request for a fixed rate loan ([the Bank] declined to offer a fixed rate loan to [the Casino]). This allegation seems to say that the Bank, via the Swap Agreement, gave the Casino a fixed 6% interest rate on the TLA at the Casino's request, because the Bank had refused to offer a fixed rate loan on the TLA. The Court doesn't know what to make of this allegation.

the Casino's personal property (the "Security Agreement" or "SA"). (*Id.* ¶ 9). Several non-parties guarantied the agreements. (*Id.* ¶ 10). The RELOC was amended three times, ultimately resulting it no longer being secured by the SA but by a separate security agreement (and the same guarantors) and extending the maturity date to August 15, 2014. (*Id.* ¶¶ 11–14).

The Casino has never missed a payment under any of the notes, and the notes are fully secured by the collateral. (*Id.* ¶¶ 15–16). On February 18, 2014, representatives of the parties met, and the Bank indicated it did not intend to renew the RELOC. (*Id.* ¶ 17). In March 2014, a representative of the Bank told a representative of the Casino that the Bank would prefer that the Casino pay off the RELOC before the maturity date. (*Id.* ¶ 18). In April 2014, the Bank made the same request, but this time the Bank alleged that the Casino was in default of certain non-monetary covenants under the RELOC. (*Id.* ¶ 19).[2] After failed attempts to resolve the matter, the Bank issued the Casino written notices of default as to both the TLA and the RELOC on May 9, 2014; the amounts then owed under the loans were $5,496,506.79 and $902,250, respectively. (*Id.* ¶¶ 20–24). On May 30, 2014, the Casino offered to pay the RELOC in full within ten days of signing an agreement resolving the dispute and to take other actions to address the Bank's concerns under the non-monetary covenants. (*Id.* ¶ 25). The Bank counteroffered on June 18, 2014. (*Id.* ¶ 29). On July 9, 2014, the Bank made offered not to impose a default interest rate on the RELOC if paid off in full by the week of July 21, 2014. (*Id.* ¶ 34). The Casino complied, but the Bank imposed a default interest rate anyway. (*Id.*).[3]

---

2 The Casino implies it was not in default because it had never missed any payments and the debt was fully secured by the collateral. In other words, it appears that the dispute is over the value of the collateral, and that the "non-monetary covenant" at issue is that the value of the collateral could not drop below the amount due on the loan (or some other amount).
3 It is not clear whether the Casino means to allege that the Bank imposed a default interest rate as to the RELOC, the TLA, or both, or whether the promise not to charge default interest if the Casino paid off the RELOC was meant to apply to the RELOC, the TLA, or both.

The Casino is prepared to pay off the TLA in full but fears the bank will argue that will trigger an early termination liability under the Swap Agreement of approximately $400,000. (*Id.* ¶ 36). The Casino is also not certain that the Bank has not transferred the Swap Agreement, and any such transfer requires the Casino's consent, which it has not given. (*Id.* ¶¶ 38–39).

The Casino seeks five declarations, which the Court will characterize as follows: (1) whether the Bank may foreclose under the SA based on a breach of a non-monetary covenant when the debt is fully secured; (2) whether the Bank may enforce the SA against the Casino's personal property when the debt is fully secured and there has been no monetary default; (3) whether the Bank's remedies include the right to sell collateral when the debt is fully secured;[4] (4) whether paragraph 2.3 of the TLA Note is in substance a liquidated damages provision, and if so, whether it is unenforceable as a penalty, and whether the Swap Agreement obviates paragraph 2.3, in any case; and (5) whether, if the bank has transferred the Swap Agreement, that transfer is invalid under paragraph 7 of the Swap Agreement and also a material breach of the Swap Agreement, and whether the Swap Agreement is vague and ambiguous concerning early termination fees and therefore unenforceable. The Casino also seeks any necessary and appropriate further relief, such as injunctions. The Bank has moved for summary judgment. The Casino has responded and has also requested additional time under Rule 56(d).

## II.  LEGAL STANDARDS

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if

---

[4] This claim appears redundant with the first.

there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In determining summary judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations and internal quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment

by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### III.  ANALYSIS

The issues before the Court are pure matters of law, i.e., contractual interpretation and the application of Nevada law to the contracts at issue. The Court therefore finds that no further discovery is required and declines the Casino's request to defer ruling until it deposes three more persons under Rule 56(d) concerning the valuation of the collateral. The Casino correctly notes that there is a factual dispute concerning the value of the collateral, but the Casino has not via the present action asked the Court to make a factual declaration as to the value of the collateral or a mixed declaration of law and fact as to whether the debt is fully secured. The Casino has only asked the Court to determine certain aspects of the Bank's legal rights and remedies *assuming* certain factual circumstances are true, including that the debt is fully secured. (*See* V. Compl. ¶ 44 (whether . . . , when the security for the indebtedness is more than sufficient."); *id.* ¶ 45 ("whether . . . , when security is adequate and . . . ."); *id.* ¶ 46 ("whether . . . , when the available security is adequate.")). Nowhere does the Casino ask the Court to actually declare the value of the collateral or whether the debt is fully secured.

A.     **The First and Third Claims**

The Court grants summary judgment to the Bank on these claims. Although the Bank argues that the Casino is in fact in default, that is not the issue. The Casino has not asked the Court to declare a non-default, and the Bank has not counterclaimed to ask the Court to declare a default. The question presented is whether the Bank may foreclose (and, under the third claim, sell the collateral, which is part of the foreclosure process) based on a breach of a non-monetary covenant when the debt is fully secured. The answer is "yes."

The Casino argues that under *Manke v. Prautsch*, 401 P.2d 680 (Nev. 1965), foreclosure of real property is necessarily improper under Nevada law where there is no monetary default, so long as the debt is fully secured. *Manke* does not stand for that proposition. The mortgagee in *Manke* sought to foreclose based on the mortgagor's failure to maintain the property, buildings, and improvements, as required by the deed of trust. *See id.* at 681. The mortgagor sued to enjoin foreclosure, and the trial court ruled for the mortgagor based on its factual finding that the mortgagee defendant had not proved a breach of the relevant covenant. *See id.* at 682–83. The Nevada Supreme Court affirmed, ruling that the trial court's factual finding was supported by substantial evidence and that it had been correct to require the mortgagee to bear the burden of proving a breach of the covenant, even though the mortgagee was the defendant in an action to enjoin a non-judicial foreclosure as opposed to a plaintiff in a judicial foreclosure action (by far the most legally interesting aspect of the case). *See id.* at 684. The *Manke* Court did not address whether there must be impairment to the security for foreclosure to occur based on a non-monetary default, because that issue was not before it, and the Court can find no authority supporting such a rule. The only reason the mortgagee in *Manke* was required to prove that the alleged waste impaired the value of the security is because the covenant at issue was explicitly so

limited. *See id.* at 682 ("and further that she will not make any alteration or alterations to said buildings or improvements *which would in any way reduce or impair or tend to reduce or impair the value of the property transferred hereunder*." (emphasis added; internal quotation marks omitted)). Indeed, in *Manke*, the impairment of the value of the collateral was not only a condition required for foreclosure based on the non-monetary default (affirmative or ameliorative waste), it was incorporated directly into the very definition of the event of default. That is, impairment of the value of the security was an element of the event of default itself. The events of default at issue in the present case are not similarly limited or defined under the TLA, and the Casino points to no authority indicating that such a limitation on events of default is inherent in the law. It has long been the case that in addition to adopting standard covenants by reference, parties to deeds of trust in Nevada may generally enter into whatever covenants they wish. *See* Nev. Rev. Stat. § 107.050 (1927).

The copy of the SA attached to the Verified Complaint lists twelve events of default, (*see* TLA § 5, at 11–13, ECF No. 1-3, at 17), only two of which concern non-payment, (*see id.* §§ 5.1, 5.2, at 11). Section 5.3 makes it an event of default for the Casino to breach any covenant that does not call for the payment of money if such breach continues for 30 days. (*See id.* § 5.3, at 11). There are covenants requiring a certain debt service coverage ratio, a ratio of total debt to tangible net worth, maintenance of cash equivalents, and a certain loan balance to appraised collateral value ratio. (*See id.* §§ 4.6, 4.10, at 8–9). It is these provisions that appear to be the source of the dispute. If the Casino has breached these provisions, there has been an event of default under the TLA, and foreclosure is permitted under the SA. (*See* SA §§ III–IV, at 20–22, ECF No. 1-4, at 43 (defining "event of default" coextensively with the term's definition under the TLA and providing the remedy of foreclosure and sale of the "Property" (real property) as

with a deed of trust and of the "Collateral" (personal property) under the UCC).  The Casino points to no Nevada law or provision of the governing documents indicating that the adequacy of the security has anything to do with the availability of the remedy.

### B.     The Second Claim

The Court grants summary judgment to the Bank on this claim.  The issue is whether the Bank may enforce the SA against the Casino's personal property when the debt is fully secured and there has been no monetary default.  The answer is "yes."  The Casino points to no Nevada law or provision of the TLA or SA preventing actions against personalty used as collateral (as opposed to actions against realty used as collateral) or requiring a monetary default as opposed to a non-monetary default.  The Casino appears to make no additional argument here apart from the argument it has presented under *Manke*.  Assuming some event of default, which, again, the Court has not been asked to declare, the TLA and SA may be enforced against the Casino's personalty under their terms, regardless of the adequacy of the security or the nature of the default.

### C.     The Fourth Claim

The Casino asks the Court to declare whether paragraph 2.3 of the TLA Note is in substance a liquidated damages provision, and if so, whether it is unenforceable as a penalty, and whether the Swap Agreement obviates paragraph 2.3, in any case.  Paragraph 2.3 reads: "Upon and during any Event [of] Default . . . the entire unpaid principal amount . . . outstanding shall bear interest at [5%] above the [interest rate then in effect] . . . ." (TLA Note § 2.3, at 2, ECF No. 1-3, at 40).

Assuming that the Nevada Supreme Court would subject default interest rates to the same reasonableness requirement as liquidated damages clauses, the provision is not unreasonable.  *See*

*Mason v. Fakhimi*, 865 P.2d 333, 336 (Nev. 1993) (noting that liquidated damages provisions providing for up to 13.3% of the purchase price had been deemed reasonable estimates of an aggrieved party's expenses related to a default). Although *Mason* concerned the breach of a real estate sales contract, and not the breach of a loan agreement, the Court has little difficulty finding that an increase in 5% to the interest rate on a real property mortgage is within the realm of reason as to a lender's estimate of damages due to a breach. Although a non-monetary breach may, depending on its nature, cause no direct monetary damages the way a failure to make a loan payment does, it can still cause consequential or incidental damages that are very difficult to calculate with precision. For example, one of the financial covenants at issue here is the requirement to keep the value of the collateral at a certain percentage of the outstanding loan balance. If the ratio becomes too low, the default interest rate gives the Bank some additional monetary benefit to compensate for the loss in the value of the collateral should it become necessary to foreclose. Alternatively, the Bank may wish to foreclose on the collateral immediately in order to sell it before the value decreases further.[5] That process is not free. There are attorneys, trustees, and others to compensate, taxes and fees to be paid, etc. None of these kinds of costs are easy to calculate.[6] The Court cannot say the default interest rate was unreasonable or akin to an unenforceable penalty.

---

[5] Reduced value of collateral may also be a cue to a lender of future financial problems of a commercial borrower. This is of course the reason for the other "non-monetary" but financial events of default. These events serve as warnings to a lender that the borrower's ability to repay may be in jeopardy, even if no payment has yet been late. It is not unreasonable for a security instrument to provide for acceleration and foreclosure under such circumstances, so that a lender may recover its investment before the chance of recovery becomes further jeopardized.
[6] It is also worth noting that Nevada has had no traditional usury law for over 30 years, and its previous usury law had never capped the legal rate below 10%, the standard in the English-speaking world for three centuries. *See* An Act Against Usury, 37 Hen. 8, c. 9 (1645) (Eng.), 3 Statutes of the Realm 996–97. As the Bank notes, the default rate in this case was under 8%.

As to the effect of the Swap Agreement on paragraph 2.3, Plaintiff appears to ask the Court to declare whether the Swap Agreement imposes a fixed 6% interest rate despite any default interest rate listed in the TLA.  The answer is "no."

First, the Swap Agreement simply does not govern or in any way affect the TLA.  As the title of the Swap Agreement already strongly implies ("International Swaps and Derivatives Association, Inc. Master Agreement"), the Swap Agreement by its own definitions applies only to various kinds of complex investment transactions, not to simple loan agreements. (*See* Swap Agreement § 14, at 16 (defining "Specified Transaction")).  In other words, it doesn't apply to the TLA by its own terms.  It is a form master agreement designed to govern past and future agreements between parties routinely entering into agreements concerning certain kinds of stock options and commodity swaps.  The use of this document to govern the TLA and RELOC would be strange.  The Swap Agreement is not well suited to govern the TLA or RELOC, because it was not designed to be used to govern loan agreements.

As the Bank notes, the purpose of such an agreement, as explained by the Court of Appeals, is for two parties to exchange cash at specified intervals based on hypothetical loans, securities, commodities, etc. *See Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 310 F.3d 1188, 1191–92 ((9th Cir. 2002).  In a simple interest rate swap, one party agrees to pay an adjustable rate of interest to the other on a hypothetical loan, while the other party agrees to pay a fixed rate of interest to the first party on the hypothetical loan. *See id.*  It is essentially a wagering contract where one party bets that interest rates will rise and the other bets they will fall.  In the present case, the parties apparently entered into the Swap Agreement so that the Casino could protect itself under the TLA and RELOC from a rising LIBOR rate.  If the adjustable rate on those loans rose above the 6% fixed rate that the Casino originally wanted, the

Bank would be bound under the separate Swap Agreement to pay the Casino the difference, so that the Casino would be no worse off in the long run.  This clarifies the otherwise unintelligible allegations in paragraph 8 of the Verified Complaint that the Bank offered the Casino a 6% fixed interest rate under the Swap Agreement because it refused to give the Casino a fixed 6% interest rate under the TLA. *See supra* note 1.  That is, the parties did not, as the Casino alleges, agree to a fixed 6% rate under the TLA.  They agreed (according to the Bank) that the Casino would pay a fixed 6% under the separate Swap Agreement, and the Bank would pay some adjustable rate thereunder, to insure the Casino against a rising adjustable rate.  But the Swap Agreement does not affect the TLA itself.  Moreover, the Court is unable to find the agreed upon interest rates anywhere in the SWAP Agreement or the Schedule attached thereto.  The Schedule to the Swap Agreement does not appear to establish or even identify any particular swap transactions itself.  The Bank has provided an explanation of what it says the actual swap under the Swap Agreement was, but that ultimately does not matter here.  What is clear (and dispositive) is that the Swap Agreement does not directly affect or govern the interest rates under the TLA and RELOC.

This finding also settles any dispute over how the Swap Agreement affects any early termination fee provisions under TLA: it doesn't.  The termination fees under § 6 the Swap Agreement itself, i.e., those applicable under the Swap Agreement if a party terminates the Swap Agreement early, are presumably enforceable.  The Court need not determine whether those fees are enforceable or vague, however, because no party has alleged a breach or impending breach of the Swap Agreement itself, and the issue is therefore not ripe.

///

///

### D.     The Fifth Claim

The Bank provides the declaration of its Vice President, Joel Spencer, who attests that the Swap Agreement has not been transferred. (*See* Spencer Decl. ¶¶ 1, 39, ECF No. 12).  The Casino provides evidence, however, that Dennis Boesen told the Casino's representatives Richard Jeha and William Kartozian at a July 23, 2014 meeting that included Mr. Spencer that the Swap Agreement had been sold. (*See* Jeha Decl. ¶ 23, ECF No. 26; Kartozian Decl. ¶ 23, ECF No. 27).

The Court has not been asked to declare whether the Swap Agreement has been transferred.  The dispute over whether a transfer occurred, however, makes the issues the Court has been asked to answer ripe.  The Court has been asked to declare whether a transfer would be invalid under the Swap Agreement and whether it would constitute a breach of the Swap Agreement.  Paragraph 7 of the Swap Agreement provides that no interest or obligation thereunder may be transferred without prior written consent of the other party, except pursuant to a corporate merger or to the extent the transferred interest is payable to it from a defaulting party as defined in paragraph 6(e) of the Swap Agreement, and that any noncompliant transfer is void. (*See* Swap Agreement ¶ 7, at 10, ECF No. 1-4, at 16).

The Court rules that any transfer of the Bank's interest or obligations under the Swap Agreement, if any such (attempted) transfer exists, without written consent of the Casino, and not pursuant to a corporate merger or to the extent the transferred interest consisted only of amounts payable to the Bank from the Casino under paragraph 6(e) of the Swap Agreement, is void. However, such a transfer does not constitute a breach, because an act that is void under the terms of a contract is a nullity.  The contract does not provide that an *attempt* to commit the act constitutes a breach, for example, under the "events of default" section.

The Court will not determine whether the Swap Agreement is unenforceable for vagueness or ambiguity, because, as noted, *supra*, there is no allegation of an impending breach of the Swap Agreement itself.  Indeed, the Casino alleges it has not failed to make any payments and is not in danger of such failure.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 11) is GRANTED, and the Court DECLARES:

1.      Bank of the West may foreclose on its March 20, 2009 Term Loan Agreement and Revolving Line of Credit Loan Agreement with Lakeside Inn, Inc., as amended, and, subject to the laws governing deeds of trust and security agreements on personal property, as applicable, sell any real and personal collateral securing those debts, based on a breach of any covenants in the relevant loan agreements or security instruments, whether the breach be monetary or non-monetary, and regardless of whether the debt remains fully secured.  Although it is apparent there is a ripe dispute over these issues, the Court does not hereby determine whether any covenants have been breached or whether the debt is fully secured, as no party has requested such a declaration.

2.      The default interest provision under § 2.3 of the March 20, 2009 Term Loan Agreement Promissory Note is not an unenforceable penalty.

3.      The February 24, 2009 Swap Agreement has no direct effect on the March 20, 2009 Term Loan Agreement and Revolving Line of Credit Loan Agreement.

4.      Any transfer of Bank of the West's interest or obligations under the February 24, 2009 Swap Agreement, if any such (attempted) transfer exists, without written consent of the Casino, and not pursuant to a corporate merger or to the extent the transferred interest consisted

only of amounts payable to the Bank from the Casino under paragraph 6(e) of the Swap Agreement, is void but does not constitute a breach.

      IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

      IT IS SO ORDERED.

Dated: This 25th day of March, 2015.

_____
ROBERT C. JONES
United States District Judge