UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| LAKESIDE INN, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> BANK OF THE WEST, ) <br> ) <br> Defendant. ) | 3:14-cv-00473-RCJ-WGC <br><br> **ORDER** |

This declaratory judgment action arises out of the breach of a loan agreement. The Court has granted summary judgment to Defendant, who has now moved for attorney's fees and costs. For the reasons, given herein, the Court grants the motion in part and denies Plaintiff's objection to the Bill of Costs.

**I.    FACTS AND PROCEDURAL HISTORY**

Plaintiff Lakeside Inn, Inc., d.b.a. Lakeside Inn & Casino (the "Casino") sued Defendant Bank of the West (the "Bank") in Nevada state court for declaratory and "further" relief under Nevada law. The Bank removed under 28 U.S.C. §§ 1441, 1332. The relief sought is cognizable under §§ 2201, 2202.

On March 20, 2009, the parties entered into a Term Loan Agreement ("TLA") and Promissory Note ("TLA Note") for $6.5 million. (V. Compl. ¶5, ECF No. 1-3). Under the 10-

year Note, the unpaid principal balance accrues interest at a rate of 2.8% above the one-month LIBOR rate, adjusted monthly ("Interest Option 2"). (*Id.*). The TLA Note matures on March 15, 2019. (*Id.*). The parties modified the TLA on April 12, 2012 via the Term Loan Modification Agreement ("TLMA"). (*Id.*). Because the Casino selected Interest Option 2 on the TLA Note, there was no prepayment penalty, and no loan fee was due. (*Id.* ¶ 6). On March 20, 2009, the parties also entered into a Revolving Line of Credit Loan Agreement ("RELOC") and Promissory Note ("RELOC Note"), attached as Exhibits 4 and 5 to the VC, for $1 million, accruing interest at a rate of 0.50% above the prime rate, and maturing on May 15, 2011. (*Id.* ¶ 7). On February 24, 2009, the parties entered into an International Swaps and Derivatives Association, Inc. Master Agreement ("Swap Agreement"), in which the parties agreed interest on the TLA would be a fixed rate of 6%. (*Id.* ¶ 8).[1]

All of these agreements were secured by a Deed of Trust and Security Agreement and Fixture Filing with Assignment of Rent against eight parcels of the Casino's real property and the Casino's personal property (the "Security Agreement" or "SA"). (*Id.* ¶ 9). Several non-parties guarantied the agreements. (*Id.* ¶ 10). The RELOC was amended three times, ultimately

---

1 The allegations in paragraph 8 of the Verified Complaint are confusing for several reasons. First, it seems odd that the Bank would agree in February 2009 to a fixed rate of 6% on a loan to be signed the following month, and then, when it came time to execute the loan itself in March 2009, provide a variable rate in the terms of the loan itself. Second, the allegation indicates that the Swap Agreement was "dated February 24, 2009" but that the parties were "authorized" to enter into the Swap Agreement via the March 20, 2009 TLA. That allegation is chronologically confusing. Perhaps the date of authorship of the Swap Agreement was February 24, 2009, but the parties did not execute it until after they executed the March 20, 2009 TLA. But the Casino has not alleged the date of execution of the Swap Agreement except to note it was "dated February 24, 2009." Third, the Casino alleges that the Bank offered the fixed 6% interest rate via the Swap Agreement "in response to [the Casino's] request for a fixed rate loan ([the Bank] declined to offer a fixed rate loan to [the Casino]). This allegation seems to say that the Bank, via the Swap Agreement, gave the Casino a fixed 6% interest rate on the TLA at the Casino's request, because the Bank had refused to offer a fixed rate loan on the TLA. The Court doesn't know what to make of this allegation.

resulting it no longer being secured by the SA but by a separate security agreement (and the same guarantors) and extending the maturity date to August 15, 2014. (*Id.* ¶¶ 11–14).

The Casino has never missed a payment under any of the notes, and the notes are fully secured by the collateral. (*Id.* ¶¶ 15–16). On February 18, 2014, representatives of the parties met, and the Bank indicated it did not intend to renew the RELOC. (*Id.* ¶ 17). In March 2014, a representative of the Bank told a representative of the Casino that the Bank would prefer that the Casino pay off the RELOC before the maturity date. (*Id.* ¶ 18). In April 2014, the Bank made the same request, but this time the Bank alleged that the Casino was in default of certain non-monetary covenants under the RELOC. (*Id.* ¶ 19).[2] After failed attempts to resolve the matter, the Bank issued the Casino written notices of default as to both the TLA and the RELOC on May 9, 2014; the amounts then owed under the loans were $5,496,506.79 and $902,250, respectively. (*Id.* ¶¶ 20–24). On May 30, 2014, the Casino offered to pay the RELOC in full within ten days of signing an agreement resolving the dispute and to take other actions to address the Bank's concerns under the non-monetary covenants. (*Id.* ¶ 25). The Bank counteroffered on June 18, 2014. (*Id.* ¶ 29). On July 9, 2014, the Bank made offered not to impose a default interest rate on the RELOC if paid off in full by the week of July 21, 2014. (*Id.* ¶ 34). The Casino complied, but the Bank imposed a default interest rate anyway. (*Id.*).[3]

The Casino is prepared to pay off the TLA in full but fears the bank will argue that will trigger an early termination liability under the Swap Agreement of approximately $400,000. (*Id.*

---

2 The Casino implies it was not in default because it had never missed any payments and the debt was fully secured by the collateral. In other words, it appears that the dispute is over the value of the collateral, and that the "non-monetary covenant" at issue is that the value of the collateral could not drop below the amount due on the loan (or some other amount).

3 It is not clear whether the Casino means to allege that the Bank imposed a default interest rate as to the RELOC, the TLA, or both, or whether the promise not to charge default interest if the Casino paid off the RELOC was meant to apply to the RELOC, the TLA, or both.

¶ 36). The Casino is also not certain that the Bank has not transferred the Swap Agreement, and any such transfer requires the Casino's consent, which it has not given. (*Id.* ¶¶ 38–39).

The Casino sought five declarations, which the Court characterized as follows: (1) whether the Bank may foreclose under the SA based on a breach of a non-monetary covenant when the debt is fully secured; (2) whether the Bank may enforce the SA against the Casino's personal property when the debt is fully secured and there has been no monetary default; (3) whether the Bank's remedies include the right to sell collateral when the debt is fully secured;[4] (4) whether paragraph 2.3 of the TLA Note is in substance a liquidated damages provision, and if so, whether it is unenforceable as a penalty, and whether the Swap Agreement obviates paragraph 2.3, in any case; and (5) whether, if the bank has transferred the Swap Agreement, that transfer is invalid under paragraph 7 of the Swap Agreement and also a material breach of the Swap Agreement, and whether the Swap Agreement is vague and ambiguous concerning early termination fees and therefore unenforceable. The Bank moved for summary judgment, and the Court granted the motion. The Bank has now moved for attorney's fees and costs.

## II.     LEGAL STANDARDS

Rule 54 requires an award of costs to a prevailing party and permits attorney's fees to a prevailing party if provided for elsewhere (by statute, rule, or contract). *See* Fed. R. Civ. P. 54(d). Local Rules 54-1 and 54-16 contain procedural and evidentiary requirements.

## III.    ANALYSIS

### A.     Attorney's Fees

The Bank notes that section 7.16 of the RELOC provides for reasonable attorney fees, expert fees, and costs to the prevailing party in any action, including those for declaratory

---

[4] This claim appears redundant with the first.

judgment, "which is in any manner related to [the RELOC] or its breach." Likewise, section 7.4 of the TLA provides for reasonable attorney fees, expert fees, and costs to the lender "in connection with the preparation, administration, and enforcement of [the TLA], [the Swap Agreement], or any of the other Loan Documents." The present action qualifies under these provisions. The Casino forced the Bank to defend a declaratory judgment action in federal court over the interpretation and enforceability of the TLA, the RELOC, and the Swap Agreement.

The Casino makes several arguments in opposition. First, the Casino argues that it did not default under the Swap Agreement, as required for fees thereunder. But the TLA itself provides for fees based on the present action instituted by the Casino to interpret the Swap Agreement. The fact that an interpretation of the Swap Agreement was required in the present case does not limit the availability of fees to those made available via the Swap Agreement itself.

Second, the Casino argues that fees are not available under the RELOC, because the RELOC was paid in full before the action was instituted. This, again, ignores the availability of fees under the TLA.

Third, the Casino argues there has been no default. That is contested, at least as to "non-monetary" defaults, but even if there had been no default, the TLA provides for fees based on the Bank's need to defend itself as to the present declaratory judgment action. The need for the Bank to defend itself in a declaratory judgment action by the Casino as to the interpretation and enforceability of the TLA is clearly an expense incurred in connection with the enforcement of the TLA and other loan documents.

Fourth, the Casino argues that the parties previously agreed no more than $161,378.36 would be sought in fees and costs, not $171,378.36. Nearly three weeks before the Casino filed

its opposition, however, the Bank had already amended the present motion to reduce the total of fees and costs sought to $145,535.23, rendering the present objection moot.

Fifth, the Casino argues that any fees and costs incurred before service of the Complaint on August 26, 2014 should necessarily be denied.  The Court rejects this argument.  When it becomes clear that litigation is impending, it is not unreasonable for the parties to engage attorneys to begin work in anticipation.  Such attorney labor is reasonably characterized as having been incurred as a result of the eventual litigation so long as the eventual litigation is causally related to the attorney labor.

Sixth, the Casino argues that some of the pre-litigation work charged is not causally linked to the present litigation.  The Casino, however, actually appears to argue that most of this labor, i.e., research as to whether certain events constituted a default, was causally related to the litigation.  The Casino also notes only that $337.50 charged for the labor of Attorney Edwards should be excluded because it is related to an "audit response" of the Bank as to its auditors and is unrelated to the present action.  The Court will disallow this amount.

Seventh, the Casino argues that the claimed rates and hours worked are unreasonable. The Court accepts the rates and the hours.  According to Mr. Holley's declaration and the evidence attached thereto, the partners billed at $445.50 (Holley) and under $300 (Edwards, Puzey, and Atomoh), the associate at $204.50 (Bassett), and the paralegal at approximately $165 (Pestonit and Latrell).  These rates are reasonable.  Only Mr. Holley's rate is "high" in the Northern Nevada market, but it is within reason for complex contractual litigation in federal court.  Defendants claim 532.2 attorney and paralegal hours.  The Court finds this to be reasonable in this moderately complex contractual case.  The hours are meticulously documented.  The lodestar (minus a $15,000 reduction via the amended motion) is therefore

$140,710.37, as noted in the amended motion.  The court finds that no multiplier is warranted.  Subtracting $337.50 for the unrelated labor leaves $140,372.87.

**B.  Costs**

The Bank seeks $4,824.86 in its Amended Bill of Costs.  The Casino objects to $2700 sought for the services of expert Perkins & Associates.  The parties dispute whether such costs are allowed under the statutes.  Whether the costs are allowed as a default under 28 U.S.C. § 1920 or other statutes, however, is irrelevant, because the expert fees are recoverable under the cost-shifting provision of the TLA directly, *see supra*.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Attorney's Fees (ECF Nos. 38, 43) is GRANTED IN PART in the amount of $140,372.87.

IT IS FURTHER ORDERED that the Objection (ECF No. 45) to the Bill of Costs is denied.

IT IS SO ORDERED.

DATED: June 1, 2015.

_____
ROBERT C. JONES
United States District Judge